UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KELLY MCGUIGGIN, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 17-11523-LTS |
| ZURICH AMERICAN INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) ) | |

ORDER ON PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT ON THE AGREED RECORD (DOC. NO. 33)

March 25, 2019

SOROKIN, J.

This action arises out of a claim for accidental death and dismemberment benefits, under a group policy issued by Zurich American Insurance Company, following the death of Kelly McGuiggin's son from acute fentanyl intoxication. Zurich rejected McGuiggin's claim after determining that the death was not accidental and, in any event, was excluded from coverage under the policy. McGuiggin sued Zurich in Massachusetts state court; Zurich removed the action to this Court. The parties seek entry of judgment on an agreed-upon record. For the reasons set forth below, McGuiggin's motion for summary judgment is DENIED, and judgment is ENTERED in favor of Zurich.

I.  BACKGROUND[1]

McGuiggin is a Massachusetts resident and an employee of Sysco Corporation. She is insured by Zurich under a Group Accident Policy ("the Policy") issued to Sysco on January 1, 2013. Doc. No. 32 at 231. The Policy provides an accidental death benefit in the event a covered person suffers a "Covered Injury" and dies.[2] Id. at 237. A "Covered Injury" is "an Injury directly caused by accidental means which is independent of all other causes, results from a Covered Accident, occurs while the Covered Person is insured under this Policy, and results in a Covered Loss." Id. at 235. A "Covered Loss" is "a loss which meets the requisites of one or more benefits or additional benefits, results from a Covered Injury, and for which benefits are payable under this Policy." Id.

The Policy contains "General Exclusions," one of which is relevant:

A loss will not be a Covered Loss if it is caused by, contributed to, or results from: . . . (8) being under the influence of any prescription drug, narcotic, or hallucinogen, unless such prescription drug, narcotic, or hallucinogen was prescribed by a physician and taken in accordance with the prescribed dosage.

Id. at 242. The Court will refer to this provision as "Exclusion 8."

In January 2016, McGuiggin's son, Colin Gear, was a twenty-year-old student at the University of Massachusetts Dartmouth. Campus police conducted a wellness check at Gear's dorm room on January 29, 2016, sometime after 10:00 p.m. Id. at 49. After gaining entry to his locked room, the officers discovered Gear alone, lying naked on his bed, "unresponsive and cold

---

[1] The Court derives the relevant facts from the agreed-upon record. Doc. Nos. 32, 33, 34, 37. There are no disputes of fact to resolve, nor any inferences to draw, in assessing the issues presently before the Court.
[2] Though the parties disagree about the amount of the benefit at stake here, the Court's finding in Zurich's favor renders resolution of that question unnecessary. Compare Doc. No. 37 at 2 (citing portions of Zurich's claim file and urging that the benefit due upon the death of a dependent child is $100,000), with Doc. No. 34 at 8-9 (pointing to language in the Policy limiting the "Principal Sum for Dependent Child(ren)" to $50,000).

to the touch." Id. He was pronounced dead by paramedics who arrived on the scene soon thereafter. Id. On a desk in Gear's room, officers observed "a single 'line' of a tan powdery substance," along with a "rolled-up twenty dollar bill," "the knotted portion of a clear plastic baggie," and a school identification card with "a powdery substance along its edge." Id.

Gear's roommates had last seen him the previous evening. Id. They reported to police that "they had suspected that [Gear] used some type of drug," as "they could hear snorting/sniffing sounds coming from [his] room" at times, and he had "appeared to be under the influence of something" on several occasions. Id. Gear's father, who had requested the wellness check, told police that Gear had admitted a heroin addiction to him the previous spring. Id.

Based on these circumstances, the initial police report regarding Gear's death described the "possible manner of death" as "heroin overdose." Id. at 50. A medical examiner performed an autopsy. Both the autopsy report and the death certificate reflect the medical examiner's conclusion that the cause of Gear's death was "acute fentanyl intoxication," and the manner of death was an "accident" that occurred due to "substance abuse" or "snorting illicit drugs." Id. at 23, 26. As part of the autopsy process, Gear's blood was tested for the presence of various substances; the resulting toxicology report reflects a positive result for fentanyl. Id. at 30.

McGuiggin notified Zurich of Gear's death on April 20, 2016 and requested the forms necessary to make a claim under the Policy.[3] Id. at 14. On June 28, 2016, she submitted her claim, providing a completed Proof of Death form, along with copies of Gear's death certificate, autopsy report, and related police reports. Id. at 16-78. After requesting pharmacy records for Gear and confirming he had no active prescription for fentanyl, id. at 163, 169, Zurich denied

---

[3] It is undisputed that Gear, as McGuiggin's dependent son, was a "Covered Person" for purposes of the Policy.

3

McGuiggin's claim by letter dated September 20, 2016, id. at 154-57.  The denial rested on Zurich's conclusion that Gear's death was "not a Covered Loss due to a Covered Injury," and that two coverage exclusions applied: an exclusion for suicide, and Exclusion 8.  Id.

McGuiggin appealed the denial to Zurich on December 9, 2016, arguing that Gear's death was accidental, that there was no evidence to suggest suicide, and that Exclusion 8 applied only to "prescription" drugs and not to "illicit" drugs.  Id. at 8-12.  Zurich's ERISA committee reviewed the claim, meeting at least twice to discuss it and requesting a legal opinion on the applicability of Exclusion 8.  Id. at 270, 273-75.  Ultimately, the committee affirmed the denial of coverage in a March 29, 2017 letter, citing Exclusion 8 but no longer invoking the suicide exclusion.  Id. at 267-69.

In June 2017, McGuiggin sued Zurich in the Dukes County Superior Court, alleging breach of contract, seeking a declaratory judgment, and claiming violations of state consumer protection laws.  Doc. No. 1-3.  Zurich removed the action to this Court on August 16, 2017, noting the Policy is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), and therefore characterizing McGuiggin's action as one arising under federal law.[4]  Doc. No. 1.  McGuiggin concedes that ERISA governs the Policy, Doc. No. 33 at 1 n.2, and she has not opposed Zurich's assertion that ERISA preempts the state-law claims in her original complaint, see Doc. No. 34 at 18 (citing decisions finding that ERISA preempts chapter 93A and breach-of-contract claims related to the denial of benefits under ERISA plans).  As such, this Court considers McGuiggin's action as one to enforce her rights under the Policy pursuant to 29 U.S.C. § 1132(a).  Wickman v. Nw. Nat'l Ins. Co., 908 F.2d 1077, 1081-82 (1st Cir. 1990).

---

[4] Zurich also noted the existence of diversity jurisdiction.

The parties urged the Court to resolve McGuiggin's claims on the pleadings and an agreed-upon record of relevant documents, with McGuiggin filing an opening motion and brief, Zurich responding, and McGuiggin replying. Doc. Nos. 27, 32. After reviewing those briefs and the record, the Court requested additional information regarding whether and how McGuiggin received the Policy. Doc. No. 38. The parties offered divergent answers to this question. Doc. No. 44. The matter is now ripe for resolution on the papers.

II.   LEGAL STANDARDS

The standard governing this Court's review of McGuiggin's ERISA claim depends on the language of the Policy. "[A] challenge to a denial of benefits is to be reviewed de novo unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc., 813 F.3d 420, 427 (1st Cir. 2016) (quotation marks omitted). If the plan "expressly provide[s] for" the insurer to have such discretionary authority, and if "notice of that reservation [is] appropriately . . . given to Plan participants," then a decision by the insurer to deny benefits "will be upheld unless it is arbitrary, capricious, or an abuse of discretion." Id.

Here, the Policy contains language "unambiguously indicat[ing] that [Zurich] has discretion to construe the terms of the [Policy] and determine whether benefits are due in particular instances." Id. at 428; see Doc. No. 32 at 244-45 (designating such authority in Section XII, Subsection K, "ERISA Claims Fiduciary"). McGuiggin has not challenged the clarity of the delegation provision. She claims, however, that she never received a copy of the Policy, and that the language delegating discretionary authority to Zurich was neither disclosed nor made available to her. Doc. No. 44 at 1. Zurich disagrees, but its submission on this topic

5

identifies only a vague hearsay statement by a Zurich employee recounting a conversation she had with a Sysco representative, and a reference to a webpage containing general benefits information for Sysco.[5] Id. at 2. Neither source cited by Zurich can support a finding, in the face of McGuiggin's sworn statement to the contrary, that she received the Policy and was notified of the delegation provision.[6] Compare id. (stating only that "each employee of Sysco is given [unspecified] insurance policy information to review" during annual enrollment, and that unspecified "information about the Plan" was available online),[7] with Doc. No. 44-1 at 2 (explicitly denying that McGuiggin received or was provided access to the Policy).

Zurich suggests that "[t]here is no separate obligation of an insurer to provide notice" of an ERISA plan's "discretionary grant of authority." Doc. No. 34 at 11. But Zurich misses the forest for the trees. Though the dispositive question in many decisions addressing the appropriate standard to apply in reviewing a denial of ERISA benefits is the clarity of the plan's delegation provision, the crux of the issue in each such case is whether the participant had adequate notice of the delegation. See, e.g., Gross v. Sun Life Assurance Co. of Can., 734 F.3d 1, 14 (1st Cir. 2013) (endorsing the view that "the critical question is whether the plan gives the employee adequate notice that the plan administrator" has discretionary authority to construe the plan's language (citing Diaz v. Prudential Ins. Co. of Am., 424 F.3d 635, 639-40 (7th Cir. 2005))). Indeed, the First Circuit explained that an abuse-of-discretion standard applies only

---

[5] McGuiggin has moved to strike the hearsay statement from Zurich's submission. Doc. No. 45. That motion is DENIED. Because the statement is not sufficient to establish Zurich's entitlement to deferential review, and because the Court has not otherwise considered it in ruling on the pending motion for summary judgment, striking the statement is unnecessary.

[6] This is so no matter how unlikely it seems to the Court that a sophisticated employer like Sysco would not routinely provide its employees with copies of, or access to, group insurance policies and other benefits documents.

[7] The Court visited the cited webpage and located neither a copy of the Policy nor a reference to the delegation provision at issue.

6

"[w]here the delegation of authority is sufficiently clear <u>and notice of it has been appropriately provided</u>" to the participant-employee.[8]  <u>Stephanie C.</u>, 813 F.3d at 427 (emphasis added).

Because the record does not establish that McGuiggin was provided notice of Zurich's discretionary authority to determine eligibility and to construe the Policy's language, the Court assesses the pending motion using the default de novo standard.

III.  <u>DISCUSSION</u>

The thrust of McGuiggin's attack is directed at Zurich's application of Exclusion 8—which she calls "the prescription drug exclusion"—to what she characterizes as an overdose "on illicit street drugs rather than 'prescription drugs.'"  Doc. No. 33 at 12.  According to McGuiggin, "it is clear" from the language of the Policy that the word "prescription" in Exclusion 8 "modifies all three of the words which follow" it (i.e., "drug," "narcotic," and "hallucinogen"), rendering the exclusion inapplicable to a death caused by "snorting illicit drugs."  <u>Id.</u>  She further urges that Exclusion 8 should be construed against Zurich, and that Zurich's elimination of a separate exclusion for injuries resulting from "alcoholism, drug addiction or the use of any drug or narcotic" supports limiting Exclusion 8 to prescription drugs.  <u>Id.</u> at 12-13.

McGuiggin's challenge fails.  Zurich's determination that Exclusion 8 encompassed Gear's fatal overdose on fentanyl was, in the Court's view, the only reasonable reading of the exclusion.  The reading McGuiggin suggests, whereby "prescription" would modify "narcotic" and "hallucinogen" in addition to "drug," is not grounded in the ordinary meaning and usage of the words.  "Prescription drug" is a commonly used term; "prescription narcotic" and

---

[8] Zurich's position, taken to its logical extreme, would mean applying deferential review even if clear language delegating authority to the insurer were admittedly—or even purposely—concealed from plan participants.  That cannot be so.

7

"prescription hallucinogen" are not. McGuiggin has not cited, and this Court has not found, a single decision by any court construing similar policy language in the manner she urges. Cf. Werbianskyj v. Zurich Am. Ins. Co., No. 3:15-cv-104, 2016 WL 4076367, at *2, *8 n.6 (N.D. Ind. Aug. 1, 2016) (upholding denial of benefits pursuant to the same exclusion, and treating marijuana as a "hallucinogen" triggering it)

The plain language of the exclusion clearly applies to any loss "caused by . . . being under the influence of any prescription drug" or any "narcotic" or any "hallucinogen," unless a valid prescription from a physician authorized use of the relevant substance in the manner it was used.[9] Doc. No. 32 at 242. Not only is fentanyl a "narcotic," it also is a "prescription drug" for which Gear had no valid prescription. See Gower v. AIG Claim Servs., Inc., 501 F. Supp. 2d 762, 765, 772-73 (N.D.W.V. 2007) (describing the death of an individual from a combination of drugs, including fentanyl prescribed to him for pain); see also Doc. No. 32 at 274, 299 (reflecting understanding of two Zurich representatives that fentanyl can be prescribed). As such, Exclusion 8 precludes coverage for Gear's fatal overdose on fentanyl—even under McGuiggin's unreasonably narrow interpretation of its language—just as it would reach a fatal overdose on heroin, or on fentanyl-laced heroin.[10] See Doc. No. 33 at 13 (suggesting Gear died from using

---

[9] That a member of Zurich's ERISA committee contemplated the possibility that a court might adopt McGuiggin's view and read the relevant language as limited to prescription drugs does not render the provision ambiguous. Doc. No. 32 at 273. Moreover, because Exclusion 8 is not ambiguous, there is no basis for construing its terms against Zurich, nor any justification for considering the deletion of a separate exclusion (e.g., former Exclusion 12) when interpreting it.
[10] The lack of evidence that some action by Gear, apart from his use of fentanyl, caused a fatal accident is of no moment. Doc. No. 33 at 12. To be sure, numerous cases exist in which courts have considered whether a covered individual's use of alcohol or a controlled substance contributed to a fatal event, such that coverage would be excluded for what otherwise might be considered an "accident." E.g., Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 85 (1st Cir. 2008) (upholding the denial of benefits under an accidental death policy where "the insured was so highly intoxicated" when he crashed his car into a tree "that his death was not an 'accident'"). Such cases, though, present causation questions not present here, where Gear's death was

8

"heroin/fentanyl," despite the medical examiner's blood tests showing the presence of fentanyl alone); Doc. No. 37 at 2 (urging without support that Gear had unwittingly used "heroin . . . laced with fentanyl").

In these circumstances, Zurich correctly interpreted and applied Exclusion 8 in denying coverage where the sole cause of Gear's death was his overdose on an exceedingly potent prescription drug.[11]

IV. CONCLUSION

The loss McGuiggin has suffered is unfathomable; she has the Court's deepest sympathy. No parent should have to bury a child. The Court's validation of Zurich's denial is not meant to diminish McGuiggin's tragic loss. It simply means that the plain language of a specific insurance policy does not provide for a particular type of coverage arising from that loss.

Accordingly, McGuiggin's motion for summary judgment (Doc. No. 33) is DENIED, her claims against Zurich are DISMISSED, and the Clerk is directed to enter judgment in favor of Zurich.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge

---

directly and exclusively caused by his use of fentanyl. Nothing in Exclusion 8 limits its application to circumstances in which a covered individual takes some action while under the influence of a prescription drug, narcotic, or hallucinogen.

[11] Zurich also based its denial on a determination that Gear's death, caused by snorting a dangerous and powerful drug alone in a locked bedroom, was so obviously risky that it was not an "accident" for purposes of the Policy. Doc. No. 34 at 12-15; see Doc. No. 32 at 235 (defining "accident" as "a sudden, unexpected, specific and abrupt event that occurs by chance at an identifiable time and place during the Policy term"). McGuiggin challenges this conclusion as well. Doc. No. 37 at 2-3. The Court need not resolve this dispute, which turns on an application of the standards set forth in Wickman, as it finds Exclusion 8 plainly precludes coverage in any event.